IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **LINDA M. BITTNER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | Civil No. 14-cv-477-CJP[1] |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social** ) | |
| **Security,** ) | |
| ) | |
| **Defendant.** ) | |

### MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Linda M. Bittner seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff applied for benefits in November, 2010, alleging disability beginning on June 1, 2007. (Tr. 25). After holding an evidentiary hearing, ALJ William L. Hafer denied the application for benefits in a decision dated January 10, 2013. (Tr. 25-31). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 19.

1

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ ignored the opinion of Marilyn Starkey, a treating physician's assistant.

2. The RFC assessment was not supported by substantial evidence because the ALJ rejected all of the medical opinions and did not indicate what evidence the assessment was based on.

3. The ALJ failed to adequately consider all of plaintiff's impairments.

4. The ALJ erred in finding only mild mental impairments and in failing to include any mental impairments in the hypothetical question posed to the vocational expert ("VE").

5. The assessment of plaintiff's credibility was legally insufficient.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20

2

C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520. Under this procedure, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

This Court reviews the Commissioner's decision to ensure that the decision

is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Bittner was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing for substantial evidence, the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

ALJ Hafer followed the five-step analytical framework described above. He found that plaintiff was insured for DIB only through December 31, 2011. He determined that plaintiff had not engaged in substantial gainful activity since the alleged date of onset. He found that she had severe impairments of diabetes,

hypertension, obesity and lumbar spinal degenerative disc disease. He further determined that her impairments did not meet or equal a listed impairment.

The ALJ found that Ms. Bittner's allegations about her impairments and limitations were not credible. He determined that, as of her date last insured, she had the residual functional capacity (RFC) to perform work at the light exertional level, with some physical limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because she was able to perform her past work as a data entry clerk.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

Plaintiff was born in 1953, and was almost 45 years old on the alleged onset date of June 1, 2007. (Tr. 131). She stopped working in October, 2006, because of her condition. (Tr. 135). A prior claim for DIB was denied on October 6, 2008. (Tr. 132).

She indicated that she was unable to work because of a number of problems including back problems, diabetes, irritable bowel syndrome, neuropathy, anxiety and panic attacks. She was 4'11" and weighed 199 pounds. (Tr. 135).

Plaintiff had completed three years of college. (Tr. 136). She worked as a

5

data entry clerk from 1999 through August, 2006, and as a receptionist at a hospital for two months in 2006. (Tr. 146).

Ms. Bittner submitted a Function Report in April, 2011. She said that she had back pain and sciatic pain from sitting or standing for long periods. She did not have a lot of stamina. She had sudden bouts of diarrhea. Her nerves were bad and she got "flustered" in stressful, busy situations. (Tr. 158). She prepared a meal about once a week, and did some laundry and small loads of dishes once in a while. Her husband did most of the meal preparation and helped her with laundry and dishes. She shopped for groceries every 8 to 10 days. She alleged problems with memory, concentration, following instructions and completing tasks. If she did too much in one day, she had to spend the next day resting in bed. (Tr. 158-165).

In a report submitted in July, 2011, plaintiff said that her medications caused dizziness and drowsiness. She felt fatigued all the time and had sleep problems. Her memory and concentration were "not good anymore to do office work." She became very anxious in stressful situations. She had "sudden uncontrollable diarrhea without warning" related to irritable bowel syndrome. (Tr. 179).

### 2. Evidentiary Hearing

Ms. Bittner was represented by an attorney at the evidentiary hearing on November 16, 2012. (Tr. 38).

Plaintiff testified that she was born in August, 1953. She graduated from

high school and did some college work. She was 4'11" and weighed about 200 pounds. She had no children under the age of 18. She had worked in 2006 as an intake receptionist at a medical clinic. Before that, she did computer data entry work for about 7½ years. (Tr. 40-42).

She had used a cane to walk at one time, but did not use one at the time of the hearing. She testified that she was doing better, but was not "all better." (Tr. 45).

A cardiologist, Dr. Falcone, recommended that plaintiff have a cardiac catheterization procedure, but she had not had it done because of problems with her husband and her father. (Tr. 46-48). Plaintiff took medication for IBS, prescribed by her primary care provider, but did not see a specialist. (Tr. 50-51). She had not seen a mental health provider because she did not "get much of anything done except visiting my dad in the nursing home." (Tr. 51). She had "floaters" in her eyes but had not gone to an eye doctor. She did not have insurance. (Tr. 54).

Much of plaintiff's testimony concerned her condition at the time of the hearing, which took place after her date last insured. She said she had pain in her back radiating into her right leg. She had headaches. She took Vicodin for pain in her knees. (Tr. 58-61).

A vocational expert (VE) also testified. She said that plaintiff's past work as a data entry clerk was semi-skilled and sedentary. The ALJ asked her to assume a person of plaintiff's age and work experience who could do work at the light exertional level, limited to occasional stooping, kneeling, crouching, crawling and

climbing stairs, no climbing of ladders, ropes or scaffolds, and no work at unprotected heights or around dangerous machinery. The VE testified that this person could do plaintiff's past work as a data entry clerk and as an admissions clerk. (Tr. 63-64).

### 3. Medical Treatment

Plaintiff was seen by Dr. Don Kovalsky at the Orthopedic Center of Southern Illinois in January, 2008, on a referral from Dr. Cheryl Emmons.[2] Ms. Bittner complained of pain in her low back and right buttocks and leg pain. She was unemployed secondary to pain and a history of depression. She walked with an antalgic gait and had been using a cane to ambulate for the past year. On exam, she had lumbar muscle spasms and positive straight leg raising on the right. She had "pain to some degree out of proportion to her findings. . . ." A lumbar MRI was done. She had "what appears to be a right-sided contained disc herniation at L5/S1 with posterior displacement of the S1 nerve root." The doctor's impression was longstanding degenerative disc disease with a probably sub-acute right-sided disc herniation at L5/S1 causing right lumbar radiculopathy. She was a poor candidate for surgery because of her weight, history of depression and diabetes. The doctor recommended a trial of conservative treatment. (Tr. 280-281).

The next record is dated February 18, 2009. On that date, Ms. Bittner was seen as a new patient at Rea Clinic in Christopher, Illinois. Her past medical

---

[2] Dr. Emmons was evidently Ms. Bittner's primary care physician for some period of time. There are no treatment records from Dr. Emmons in the record.

8

history included herniated discs, IBS, diverticulitis, and anxiety/depression. The assessment was Type II diabetes, poorly controlled, high blood pressure, IBS and depression. She was prescribed medication for these conditions, including Celexa for depression. (Tr. 230). On February 26, 2009, she was prescribed Neurontin for neuropathy in her right lower extremity. (Tr. 229). In March, 2009, her numbness and pain were better on Neurontin. She was to sign up for the "indigent med program." (Tr. 228). In June, 2009, it was noted that she had not had a colonoscopy, but she was "unable to finance." (Tr. 226).

In September, 2009, Ms. Bittner was seen at Rea Clinic for chest pain and swelling in her lower extremities. She was to have a cardiology consult. (Tr. 223). In December, 2009, her chest pain and shortness of breath had improved. (Tr. 221). She came in to have her medications refilled in October, 2010. She was to continue taking Celexa for depression. (Tr. 219). In November, 2010, P.A. Starkey noted that plaintiff was "maxed" on oral diabetes medications, but she declined starting on insulin because her husband did not want her to. (Tr. 218). In December, 2010, it was noted that she had depression and anxiety. She was walking her dog 10 blocks daily. (Tr. 217).

Ms. Bittner continued to be seen at Rea Clinic through at least October, 2012. (Tr. 341-381). However, the first office note for the year 2011 is dated December 8, 2011. On that date, she complained of headaches for the past three weeks. She also complained of ongoing pain in her right thigh. P.A. Starkey noted that her "chronic problems" included diverticulitis, diabetes, and depression. (Tr. 358).

She was described as "chronically ill-appearing." There was no edema in her extremities. She indicated that she was sleeping more than 15 hours at a time, several times a week. (Tr. 359).

Ms. Bittner was insured for DIB only through December 31, 2011.

In July, 2012, Ms. Bittner was seen at Rea Clinic for chest pain. She was again described as "chronically ill-appearing." A stress test was normal. She was referred for a cardiac evaluation. (Tr. 345-349). She was seen at Prairie Cardiovascular in August, 2012. Her stress test showed no evidence of reversible ischemia. The doctor discussed the possibility of a cardiac catheterization, but plaintiff did not want to consider it as her symptoms had improved. She was given a prescription for nitroglycerin. The diagnoses were chest pain (not otherwise specified), shortness of breath, hypertension, Type II diabetes, obesity, coronary artery disease and hypothyroidism. (Tr. 332-333).

    4.    **Consultative Examinations**

On March 14, 2011, Dr. Adrian Feinerman performed a consultative physical examination at the request of the agency. Dr. Feinerman reported that Ms. Bittner had no redness, warmth, thickening, effusion or limitation of movement of any joint. Grip strength was strong and equal. She walked normally without an assistive device. She had crepitation of both knees. Muscle strength was normal throughout with no spasm or atrophy. Fine and gross manipulations were normal. The range of motion of the spine was full. Straight leg raising was negative. Sensory examination was normal. She was 4'11" tall and weighed 211

pounds.  (Tr. 240-248).

James Peterson, Ph.D., performed a consultative psychological exam on March 14, 2011.  Plaintiff was taking Celexa for anxiety and depression.  She reported chronic worrying and symptoms of OCD.  She also reported pressured speech, and Dr. Peterson observed that she spoke rapidly and perseverated.[3]  Dr. Peterson diagnosed generalized anxiety disorder and obsessive-compulsive disorder.  He noted that she "did not describe symptoms of depression that were clinically significant."  (Tr. 251-253).

Dr. John Coe performed another consultative physical examination on August 18, 2011.  Ms. Bittner had pain behind the right patella and tenderness in the lumbar spine.  Her gait was normal and she was able to get on the examining table but had difficulty getting off of it because of her weight.  Straight leg raising was negative.  The range of motion of the back was almost full.  She had decreased sensation along her lower lateral right leg.  The diagnoses were severe obesity, diabetes, hypertension, back pain with past nerve injury and irritable bowel syndrome.  (Tr. 291-299).

Fred Klug, Ph.D., performed a second consultative psychological exam on August 24, 2011.  Dr. Klug reported that plaintiff's immediate, short term and long term memory were intact.  Attention and concentration were adequate. Reasoning and abstract thinking were fair, and judgment and insight were poor.

---

[3] Perseveration is "An inability to switch ideas along with the social context, as evidenced by the repetition of words or gestures after they have ceased to be socially relevant or appropriate." http://psychcentral.com/encyclopedia/2008/perseveration/, visited on May 27, 2015.

Expressive language was good with adequate volume and rate. She did not have any idiosyncratic use of words. Her thought processes were circumstantial and production was overabundant. She had "a lot of social anxiety." She did not experience obsessions, but she did say that she had a "mild hoarding problem." Dr. Klug noted that her affect was tearful and consistent with her thought content, and that she "reported feeling depressed most of the time for the last 20 years." His diagnoses were social phobia, dysthymic disorder-late onset, generalized anxiety disorder, rule/out post-traumatic stress disorder. (Tr. 303-307).

### 5. Opinion of Treating Doctor

On August 1, 2012, P.A. Starkey wrote a letter "To Whom It May Concern." This letter seeks assistance with air conditioning bills as both Mr. and Mrs. Bittner "have hypertension and recurrent chest pain and experience shortness of breath upon any activity." (Tr. 342). Plaintiff contends that this is a medical opinion.

### 6. State Agency RFC Assessments

In September, 2011, a state agency physician assessed plaintiff's physical RFC based on a review of the medical records. He concluded that she could do medium work, limited to no climbing of ladders, ropes or scaffolds, and only occasional climbing of ramps and stairs. (Tr. 322-329).

Another state agency consultant completed a Psychiatric Review Technique form stating that plaintiff did not have a severe mental impairment. (Tr. 308-320).

### 6. Medical Records Not Before the ALJ

The transcript contains medical records that were not before the ALJ. Plaintiff submitted the additional records to the Appeals Council, which considered them in connection with her request for review. See, AC Exhibits List, Tr. 4. Thus, the medical records at Tr. 396-401, designated by the Appeals Council as Exhibit 14F, were not before the ALJ.

The medical records at Tr. 396-401 cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence. Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error." *Luna v. Shalala*, 22 F3d 687, 689 (7th Cir. 1994). See also, *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 366, n. 2 (7th Cir. 2004).

## Analysis

The Court first turns to plaintiff's challenge to the ALJ's credibility determination.

Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein. The credibility findings of the ALJ are to be accorded deference, particularly in view of

the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, 1996 WL 374186, at *3. "[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid.* See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir., 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.")

As plaintiff points out, ALJ Hafer expressed his credibility findings in the boilerplate language that was criticized in cases such as *Bjornson v. Astrue*, 671 F.3d 640, 644-645 (7th Cir. 2012), and *Parker v. Astrue*, 597 F.3d 920, 921-922 (7th Cir. 2010). However, the use of the boilerplate language does not automatically require reversal. It is harmless where the ALJ goes on to support his conclusion with reasons derived from the evidence. See, *Shideler v. Astrue*, 688 F.3d 306, 310-311 (7th Cir. 2012); *Richison v. Astrue*, 462 Fed. Appx. 622, 625-626 (7th Cir. 2012). ALJ Hafer failed to do so here.

14

Of particular relevance to this case, an ALJ may not conclude that a claimant is exaggerating her pain and limitations based on lack of medical treatment or failure to take medication without taking into account the claimant's inability to afford treatment. *Garcia v. Colvin*, 741 F.3d 758, 761-762 (7th Cir. 2013), citing SSR 96-7p, 1996 WL 374186, at *7-8.

The ALJ's credibility analysis in this case is remarkably brief. ALJ Hafer relied heavily on the fact that "the claimant has had little ongoing treatment" for his conclusion that her allegations were not credible. (Tr. 30). However, he never addressed plaintiff's lack of insurance.

Plaintiff testified that she had no insurance. (Tr. 54). The medical records reflect that plaintiff had difficulty affording treatment and prescribed medications. (Tr. 226, 228). An ALJ may not "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014).

There are additional problems with the credibility analysis. The ALJ was required to consider the side effects of plaintiff's medications. 20 C.F.R. §404.1529(c); SSR 96-7p, 1996 WL 374186, at *3. Here, plaintiff alleged that her medications caused side effects of dizziness and drowsiness. (Tr. 179, 186). However, the ALJ never mentioned plaintiff's alleged side effects.

The ALJ stated that he relied in part on plaintiff's daily activities of "driving, shopping, and frequent[ly] visiting her father in a nursing home." (Tr. 31). The

15

Seventh Circuit has noted that, while it is proper for the ALJ to consider a claimant's daily activities, the ALJ must exercise caution in equating an ability to perform daily activities with an ability to work full-time in a competitive employment situation. *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014). This is especially true where the activity in question is "caring for a family member." *Ibid.* Here, there was no evidence that Ms. Bittner performed any services for her father; the evidence was only that she visited him in a nursing home. It is difficult to see how plaintiff's ability to visit her father in a nursing home either undermined her credibility or demonstrated an ability to work.

The erroneous credibility determination requires remand. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014), *Pierce*, 739 F.3d at 1051. Here, plaintiff's testimony is not incredible on its face, and it is clear that the decision depended in large part on plaintiff's credibility.

It is not necessary to address plaintiff's other points, but, as in *Pierce*, the determination of plaintiff's RFC will require "a fresh look" after reconsideration of Ms. Bittner's credibility. *Ibid.* In particular, the determination that plaintiff had no serious mental impairments and the effects of her obesity should be reviewed.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Bittner was disabled as of her date last insured or that she should be awarded benefits. On the contrary,

the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Linda M. Bittner's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:** May 28, 2015.

> s/ Clifford J. Proud
> **CLIFFORD J. PROUD**
> **UNITED STATES MAGISTRATE JUDGE**